COHANSEY GLASS MFG. CO. v. FIRST NAT. BANK OF PHILADELPHIA.

(Circuit Court of Appeals, Third Circuit. June 20, 1918.)

No. 2350.

1. PLEDGES ⊂⇒36—ACTION AGAINST PLEDGEE—JURY QUESTION.

Evidence *held* to warrant the submission to the jury of the question whether a corporation, through its president, had assented to the private sale of collateral held by a bank.

2. APPEAL AND ERROR ⊂⇒1056(5)—EXCLUSION OF EVIDENCE—HARMLESS ERROR.

Exclusion of evidence in an action tried to a jury *held* not prejudicial error.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by the Cohansey Glass Manufacturing Company against the First National Bank of Philadelphia. Judgment for defendant, and plaintiff brings error. Affirmed.

John Kent Kane and Hampton L. Carson, both of Philadelphia, Pa., for plaintiff in error.

Joseph S. Clark and Owen J. Roberts, both of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. In 1909 the Cohansey Company owed the bank four notes, aggregating about $50,000. With the notes were deposited as collateral security certain shares of stock in the American Window Glass Machine Company. The notes, which were in simple form and did not contain the customary provisions of collateral notes, were not renewed, but remained in default for a number of years. Early in 1915 the stock advanced in value, leading to some discussion between the bank and the company, and in May Mr. Law, the president of the bank, wrote to Mr. Milliken, the president of the company, and suggested that the bank should sell the stock through a broker in Pittsburgh, where the principal market was to be found. In response to this letter, Mr. Milliken verbally informed the bank that the stock might be sold at the bank's pleasure, but expressed the hope that the sale might be deferred, as the stock would probably go higher and the company might profit by the rise. The bank verbally rejoined that the stock would be sold when the price increased sufficiently to pay the debt. The stock was sold privately, and, while the sales were going on, Mr. Milliken discussed with the vice president of the bank the amount of the sales and the prices obtained, making no claim that the company was entitled to notice of the sales; none having in fact been given. The sales were made in September, and enough was realized to pay the debt, with a surplus of $727.08. The bank paid the surplus and returned the notes, with a statement of account, which was afterwards changed in form in accordance with the company's request. In January, 1916, the company tendered the debt and interest and demanded the stock; but the bank refused, as-

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
251 F.—12

serting that the company had agreed to the sale. Thereupon the company sued for conversion, claiming as damages the highest market value after the sale. The defenses were: (1) The company's previous agreement to the method of sale; and (2) ratification with full knowledge. At the trial, the court overruled the second defense, but submitted the first, with instructions that are not now complained of. The jury found for the bank.

[1] In order to understand the argument for reversal, the course of the trial should be given in some detail. After putting in evidence the notes and the pledge of the stock, the company offered Mr. Law's letter of May 22, 1915, to Mr. Milliken:

"You have doubtless noticed that the American Window Glass Machine Co. preferred shares were quoted yesterday at 85. 97 for the preferrd and 20 for the common would pay the debt of the Cohansey Glass Co. to this bank, principal and interest.

"As we stated to you yesterday, we are very anxious not to overstay the market. If the preferred should advance to 97, it seems to us that we should realize, giving you first an opportunity to buy the stock for the company and pay the debt to us, before offering it outside. If you are not in a position to buy the stock, would it not be well for us to place an order to sell at the above figures with some reputable Pittsburgh broker, you writing us a letter consenting to the above course?"

—and followed it by a letter of September 28 from the assistant cashier after the sale:

"In accordance with our advices of May 22, 1915, we have taken advantage of the present rising market to liquidate the collateral to the Cohansey Glass Co. notes held by this bank. The preferred was sold at an average of approximately 94½, and the common around 22, and after paying the notes in full, with interest, there is a balance left of $727.08, for which check is inclosed herewith, together with a statement of the account.

"We further inclose canceled notes, and $5,000 in Cohansey scrip, which was additional collateral to the loan."

The check and statement of account were then offered, and a letter of September 30 from Mr. Milliken to Mr. Law:

"I have received a letter from your assistant cashier, dated September 28, inclosing a check for $727.08 as the balance from the transaction stated in the letter.

"I must confess to surprise that the sale should have been made without notice to me, as I had a distinct understanding with Mr. Lea, your predecessor, and with you, that no sales should be made without notice and an opportunity to my people to take up the stock and pay off your loan.

"While you are doubtless entirely within your legal right, it would seem that a gentleman's agreement had been overlooked."

To this Mr. Law replied on October 4:

"Your letter of recent date has been referred to Mr. Lea, and he asks that you call to see him here on Wednesday next between 12 and 2 o'clock."

Apparently the company was not satisfied with the form of statement sent by the bank on September 28, as the following letters will show:

From the assistant cashier, October 18:

"If you will be good enough to return the memorandum of the Cohansey transaction previously sent you, we will be glad to have it made up in the

form you desire. We kept no copy of it, and while the figures could be gathered from our books, it would save considerable time if you would let us have the use of the memorandum for a few days."

From Mr. Milliken, October 19:

"As requested, I inclose the original memo of the Cohansey transaction. I am sorry to trouble you, but as this is my voucher, I am anxious it shall explain the whole matter.

"I appreciate very much your attention to it."

From the assistant cashier, October 25:

"Please find inclosed herewith complete statement of the transactions of the Cohansey Glass Manufacturing Co. with this bank. If this is not in the form you desire, or you wish any explanation of the entries, I will be very glad to furnish it to you."

The company also proved a resolution of its directors, passed in June, 1914, which (after reciting that the stock had been pledged in December, 1904, by the board's authority, but that the minutes contained no note of the board's action) empowered Mr. Milliken to execute such other assignment as might be necessary to effectuate the pledge. The company also called one of its directors, who testified to an assurance from Mr. Lea, the predecessor of Mr. Law, that the stock would not be sold without first consulting the company. After offering, but immediately withdrawing, three papers signed by some of the company's creditors (to which we shall hereafter refer), the company then rested.

On behalf of the bank, Mr. Law testified to a conversation with Mr. Milliken in the spring, concerning the suggested private sale of the stock, and to Mr. Milliken's assent thereto; and the bank's vice president testified to a similar assent or acquiescence while the sales were proceeding. This was the case for the bank, and it is plain that the evidence thus outlined presented the question of fact whether the company, acting by its president, had agreed to the method of sale, and perhaps presented the further question whether the sale had been ratified. The question of ratification is not now before us, as the court ruled it out, and as this ruling was in favor of the company it is, of course, not assigned for error.

[2] Upon the other question, it is clear that the president could not bind the company if he lacked authority to make the agreement, and therefore, in order to prove such lack of authority, the company offered in rebuttal the papers that had already been offered in chief, but had then been withdrawn. The trial judge excluded them, unfortunately without reading, "on the practical ground that I shall instruct the jury that the conversations detailed by the witnesses should not amount to a waiver of any of the rights of the plaintiff." The company offered nothing further in rebuttal, and the case was submitted to the jury on the question whether the agreement set up by the bank had been made. We are now asked to reverse, on the ground that the sentence just quoted misled counsel into believing that none of the company's rights had been waived—in effect, that the judge would direct a verdict for the company—whereas the question whether

the company had waived its right to notice and to a public sale was immediately submitted.

In an unreported opinion refusing a new trial the learned District Judge has explained that he supposed the papers were offered to rebut the defense of ratification, and that he excluded them because he intended to rule that the evidence on this subject was not sufficient, and did not "amount to a waiver of any of the rights of the plaintiff"— that is, did not amount to ratification. From the colloquy that followed, it plainly appears that he intended to submit the other question, for he stated what measure of damage he would lay down in case the jury should reach that point, clearly meaning that the verdict might be for the bank, and in that event, of course, no damages would be found. What we are concerned with, therefore, on this record, is the effect of the ruling on the question that was submitted, namely, the agreement set up by the bank and (involved in this) Mr. Milliken's power to agree. The company had offered the papers "on the question of the authority which the creditors who signed these papers had given to Mr. Milliken," arguing that "[the papers] showed the rights of the other creditors," and declaring that the offer was to prove "that it made no difference what Mr. Milliken talked about with these officers. He had not the power, and could not take away the rights of other people." This was plain enough, and, although the court unfortunately misunderstood it, the company is entitled to the benefit of its exception, and to have the papers considered now in the light of the purpose that the court failed to grasp. On the other hand, the court's ruling is to be judged by its actual effect, and not by the reason that was given to support it. In a word, the company was offering to show Mr. Milliken's lack of power to make the agreement in question, and to that end was offering the papers to prove that the company's principal creditors (among them the bank itself) had in effect taken control of its affairs, and therefore that Mr. Milliken no longer had—and the bank was charged with knowledge thereof—the apparent power to agree that might otherwise have belonged to his office as president. We have therefore examined the papers, and are of opinion that, if admitted, they would not have proved his lack of power in 1915 to do what the jury has found that he did.

No further offer was made, and no other question is presented by this record. If the learned judge had been convinced that his ruling had harmed the company, we are confident that his well-known fairness would have led him to grant a new trial.

The judgment is affirmed.